UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**THE UNITED STATES OF AMERICA**
for the use and benefit of
**ALLAN MYERS VA, INC., et al.,**

      **Plaintiffs,**

                                    Civil No. 2:21cv657

v.

**OCEAN CONSTRUCTION SERVICES INC.,**
**et al.,**

      **Defendants.**

## OPINION AND ORDER

This case arises from a contractual dispute between Plaintiff Allan Myers VA, Inc. ("Myers") and Defendant Ocean Construction Services, Inc ("OCS") involving renovation work performed in sections of Arlington National Cemetery (the "Project"). Presently before the Court is Myers' motion for partial summary judgment. ECF No. 38. For the reasons stated below, the motion is **DENIED**.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 5, 2020, OCS contracted with the United States Army Corps of Engineers ("USACE") to renovate sections of Arlington National Cemetery. Shortly thereafter, OCS and Myers entered into a subcontract (the "Subcontract") requiring Myers to perform the utility earthwork, concrete, and asphalt work for the Project. The Subcontract contains a termination for default clause in the

event that Myers breaches or fails to perform its work in an acceptable manner, which at Article 10.1 states in relevant part:

> Should the Subcontractor at any time breach this Subcontract or fail to prosecute its Subcontract work with promptness, diligence and efficiency or fail to perform any of the requirements hereof . . . . Contractor may, after providing Subcontractor 3 business days' written notice to cure, given either by registered mail, certified mail, commercial carrier overnight delivery, facsimile delivery with a receipt, or by delivery in person to a representative of Subcontractor, proceed as follows: . . . .
>
> (b) Terminate the Subcontract and employment of the Subcontractor, enter upon the premises and take possession, for the use in completing the Work, of all materials and supplies, thereon and complete the Work, or have same completed by others, and be liable to Subcontractor for no further payment under the Subcontract until final payment is due then only if and to the extent that the unpaid balance of the amount be paid under this Subcontract exceeds the expense of the Contractor in finishing the Work.

ECF No. 38-2, at 8.

Over the course of the Project, Myers repeatedly failed to perform its work to the satisfaction of USACE and OCS, resulting in numerous delays and disagreements as to how the work should be completed. On July 15, 2021, after months of disputes, USACE issued a "cure notice" to OCS regarding the project and threatened to terminate the contract unless issues relating to Myers' performance were remedied. OCS then notified Myers of the issues USACE identified, and Myers agreed to correct its problems moving forward.

Despite Myers' agreement to correct deficiencies, further Project failures caused USACE to issue a "safety stand down notice" on July 29, 2021, which halted all work on the Project due to numerous safety defects. USACE thereafter demanded that OCS provide a recovery plan for the Project; however, on August 2, 2021, OCS informed Myers that USACE rejected OCS's proposed recovery plan, and that the stand down order would remain in effect until a new plan was submitted and approved.

On August 9, 2021, OCS delivered a cure notice to Myers, and citing Article 10.1 of the Subcontract, demanded a cure to existing defects within three days or else the Subcontract would be terminated for default. That same day, unbeknownst to Myers, OCS sent a letter to USACE stating in part that OCS would not be utilizing Myers as a subcontractor going forward, that Myers' subcontract would be terminated, and that OCS would replace Myers with another subcontractor.

On August 11, 2021, Myers sent OCS a letter in response to the cure notice accusing OCS of interfering with Myers' efforts to cure, but also noting that Myers remained ready and willing to perform in accordance with the Subcontract. The following day, Myers' employees attempted to access the project site, but they were informed by OCS via email that work was suspended due to the USACE safety stand down order. That same day, by letter, OCS responded to Myers' August 11 letter and disputed Myers'

3

characterization of the events that led to the safety stand down order. That afternoon, Myers replied, via letter, affirming its stance on the topics discussed. Despite Myers' willingness to continue as subcontractor, on August 16, 2021, OCS sent Myers a letter terminating the Subcontract for default.

Approximately one month after the Subcontract was terminated, Myers filed a four-count complaint in this Court alleging: (1) OCS and Westfield Insurance failed to fully compensate Myers for completed work; (2) OCS wrongfully terminated the Subcontract; (3) OCS materially breached the Subcontract; and (4) OCS illegally restricted Myers from retrieving its equipment from the project site following the termination of the Subcontract. ECF No. 1. OCS thereafter filed a counterclaim alleging that Myers breached the Subcontract by failing to perform its work in accordance with the Project requirements. ECF No. 10.

On December 28, 2021, Myers filed the instant motion for partial summary judgment, arguing that there is no genuine dispute of material fact as to Counts 2 and 3, and further arguing that OCS's breach prevents OCS from recovering on its breach of contract counterclaim. ECF Nos. 37, 38. OCS filed an opposition brief contending that summary judgment should be denied because it fulfilled the requirements of the Subcontract before terminating Myers for default, and that consequently, Myers cannot prove its claims as a matter of law. ECF No. 40. Myers filed a reply brief

4

asserting that OCS could not show any genuine dispute of material fact, and additionally, that OCS's counterarguments fail as a matter of law.  ECF No 41.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a district court shall grant summary judgment in favor of a movant if such party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986) (emphasis added).  "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012).

Although the initial burden on summary judgment falls on the moving party, once a movant properly submits evidence supporting summary judgment, the non-moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).  "Because '[c]redibility determinations, the

5

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,'" the Court must only evaluate the evidence to the extent necessary to determine whether there is "'sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that one party must prevail as a matter of law.'" McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (first alteration in original) (quoting Anderson, 477 U.S. at 251-52, 255). In making its determination, "the district court must view the evidence in the light most favorable to the nonmoving party." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568 (4th Cir. 2015) (internal quotation marks omitted).

### III. DISCUSSION

Myers asserts that it is entitled to summary judgment because the undisputed facts demonstrate that it was not provided with a three-day cure period, a contractual prerequisite to OCS terminating the Subcontract for default. ECF No. 38, at 5. As described above, the same day that OCS sent Myers a written cure notice outlining Myers' deficient performance, ECF No. 38-3, at 12, OCS informed USACE that it would replace Myers with another subcontractor. Myers argues that the suspicious timing of the August 9 correspondence between OCS and USACE demonstrates that OCS materially breached the subcontract as it failed to provide Myers with a true opportunity to cure the alleged default. In

6

response, OCS argues that summary judgment is inappropriate because it directly complied with the contractual termination provisions by sending Myers a proper default notice with an opportunity to cure defects followed by a proper termination notice more than three business days later.

Under Virginia law, the elements of a breach of contract are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of the obligation. Filak v. George, 267 Va. 612, 619, 594 S.E.2d 610 (2004). As the first prong is undisputed, the issues now before the Court are whether OCS materially breached the terms of the Subcontract, and if so, the extent of Myers' resulting injury.

When assessing the meaning of disputed contract terms, Virginia law requires an examination of the intentions of the parties, Virginia Electric & Power Co. v. Northern Virginia Regional Park Authority, 270 Va. 309, 319, 618 S.E.2d 323, 328 (2005), and then courts are to give effect to those intentions. See Baistar Mech., Inc. v. Billy Casper Golf, LLC, No. 141781, 2015 WL 10990120, at *4 (Va. Oct. 22, 2015). To determine the parties' intentions, a court must look at the contract as written, without adding terms not contemplated by the parties. RECP IV WG Land Investors LLC, v. Capital One Bank (USA), N.A., 295 Va. 268, 283, 811 S.E.2d 817, 825 (2018); Ames v. American Nat'l Bank of

7

Portsmouth, 163 Va. 1, 38, 176 S.E. 204, 216 (1934) ("It is the court's duty to declare what the <u>instrument itself</u> says.") (emphasis added). Additionally, absent an ambiguity, a court cannot look to any other outside factors to construe the contract. Id.; <u>Bridgestone/Firestone Inc. v. Prince William Square Assocs.</u>, 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995) ("When the terms in a contract are <u>clear</u> and <u>unambiguous</u>, the contract is construed according to its plain meaning.") (emphasis added).

Here, the Court finds that the provision of the Subcontract at issue, Article 10.1, is unambiguous on its face. Article 10.1 plainly provides that if Myers breaches or fails to perform its work in a satisfactory manner, OCS, after providing three business days' written notice to cure, may terminate the Subcontract for default. The undisputed evidence before the Court shows that OCS provided a written notice to cure on August 9, 2021, and more than three business days later, provided a notice of default termination on August 16, 2021. ECF Nos. 40-7, 40-10. Notwithstanding OCS's technical compliance with the contractual notice provisions, Myers claims that it was not provided with a <u>legitimate</u> chance to remedy deficiencies during the three-day cure period. Myers' argument relies heavily on two uncontested pieces of evidence: (1) the August 9 correspondence between USACE and OCS indicating that OCS had a plan in place to replace Myers as a subcontractor; and (2)

8

OCS enforcing the USACE-issued stand down order, thus preventing Myers from working on the Project site.

### 1. OCS's August 9 Letter to USACE

Myers argues that the week-long cure period allotted by OCS was specious and provided no real opportunity to cure because OCS had already decided that it was going to replace Myers with another subcontractor.[1] To succeed on summary judgment, Myers must identify undisputed facts establishing that OCS breached the Subcontract.[2] However, Myers' contentions require the Court to weigh and balance facts and inferences to discern whether OCS intended to act in a manner that comports with the Subcontract.

---

[1] Myers cites two cases regarding a contractual termination provision that was violated by the contractor based on its failure to provide the subcontractor with advance written notice of an alleged breach, with the contract in one of the cases also requiring that the subcontractor be provided an opportunity to cure. See Shen Valley Masonry, Inc. v. Cahill & Assocs., Inc., 57 Va. Cir. 189 (2001); MCK Bldg. Assocs., Inc. v. St. Lawrence Univ., 301 A.D.2d 726, 727, 754 N.Y.S.2d 397, 398 (2003). While these cases are not directly on point because OCS did in fact provide Myers with advance written notice of the claimed defects as well as a cure period, whether Myers received a legitimate cure period is squarely in dispute.

[2] To the extent that Myers argues that the August 9 letter between OCS and USACE by itself constitutes a repudiation of the Subcontract, Myers must show that OCS provided a "positive, unconditional, and unequivocal" notice to Myers that it would not perform its obligations under the Subcontract. City of Fairfax, Va. v. Washington Metropolitan Area Transit Authority, 582 F.2d 1321 (4th Cir. 1979); accord Altmayer-Pizzorno v. L-Soft Intern., Inc., 302 Fed. App'x. 146, 153 (4th Cir. 2008) (applying Maryland law) ("[A] contract may be terminated through conduct that is clearly inconsistent with the continued existence of the contract.") (emphasis added). The uncontested facts before the Court indicate that Myers was not even aware of the contents of the aforementioned letter until well after termination of the Subcontract, and therefore the letter does not satisfy as unconditional notice to Myers under Fairfax.

As a result, such a request not only conflicts with the general summary judgment standard of review, but it overlooks the additional guidance from the Fourth Circuit indicating that district courts "must be especially cautious in granting summary judgment when the disposition of a case turns on a determination of intent." Morrison v. Nissan Co., Ltd., 601 F.2d 139, 141 (4th Cir. 1979). Contrary to Myers' assertions in its reply brief, ECF No. 41, at 8-9, the legal proposition addressed in Morrison is broadly applicable and holds true regardless of whether there is a patent ambiguity in the contract at issue. 601 F.2d at 141; see also 10B Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 2730 (4th ed. April 2022 Update).

Myers maintains that intent is not in question here; however, evaluation of the legitimacy of the cure period—based in part on the OCS-USACE letter—necessarily requires consideration of OCS's intent when it issued the cure notice. Such an inquiry raises a genuine issue of fact as to whether OCS gave good faith consideration to Myers' efforts to cure. Croly v. Matson Nav. Co., 434 F.2d 73, 76-77 (5th Cir. 1970) (denying summary judgment on the basis that a company's state of mind can be proved only by showing the state of mind of its employees and thus requiring witness testimony); Gen. Analytics Corp. v. CNA Ins. Cos., 86 F.3d 51, 54 (4th Cir. 1996) ("[D]etermining intent is fact-intensive, and when the circumstantial evidence of a person's intent is

10

ambiguous, the question of intent cannot be resolved on summary judgment."). Because the filings and declarations before the Court reveal disputed facts and conflicting inferences from which a trier of fact could reasonably reach different conclusions regarding the legitimacy of the cure period as informed by OCS's state of mind, this issue cannot be resolved on summary judgment.

### 2. Enforcement of the Safety Stand Down Order

Myers next argues that even though a cure period was announced, the undisputed facts demonstrate that OCS did not provide Myers a legitimate opportunity to remedy its defects since the safety stand down order was in place for the entirety of such period. Myers claims that even if the three-day notice was nominally provided, it had no practical chance to cure the default because OCS, in enforcing the USACE-issued stand down order, prevented Myers from entering the job site and performing the necessary work. OCS claims in response that a "cure proposal" submitted by Myers did not "adequately address the concerns of OCS regarding the issues set forth" in the August 9 cure notice—to include the problems leading to the issuance of the safety stand down order—and therefore, Myers was not allowed to work on the site. ECF No. 40-1.

Consistent with the analysis in the preceding section, Myers' arguments regarding the safety stand down order require the resolution of competing facts and inferences. Even assuming that

11

the safety stand down order played a role in Myers' inability to cure, "[t]he relevant question is not the timing of [OCS's] decision to terminate but whether, in making that decision, [it] considered all of [Myers'] efforts to comply with the cure notice." <u>Cervetto Bldg. Main. Co. v. United States</u>, 2 Cl. Ct. 299, 302-03 (1983). Reason dictates that it may have been permissible for OCS to enforce the stand down order, and even make a tentative decision to terminate the Subcontract, so long as it gave legitimate consideration to Myers' subsequent timely efforts to cure, to include Myers' August 11 proposal and Myers attempt to work despite the safety stand down order.

Viewing the evidence in OCS's favor, a reasonable trier of fact could find that, in light of Myers' multiple alleged defects, the seven-day period OCS provided to Myers, even with the USACE-issued safety-stand down order in place, gave Myers the contractually required opportunity to cure the issues that had caused the project to fall months behind schedule. This is so because, as announced in the cure notice, ECF No. 38-3, a reasonable trier of fact might conclude that the safety stand down order was in place due to Myers' own conduct, and there is no evidence before the Court establishing that Myers completed the requisite steps for USACE to lift the stand down order so that Myers could address the remaining issues in the cure notice. As a result, Myers does not point to undisputed facts demonstrating

12

that OCS in fact used the safety stand down order to intentionally prevent Myers from having a legitimate opportunity to cure. Instead, it remains plausible that Myers hampered itself from curing the long list of defects it was purportedly responsible for causing by not providing a satisfactory fix to the safety problems after the cure notice was issued.[3] Accordingly, regardless of whether the "OCS-USACE letter" and "safety stand down" arguments are considered individually or collectively, Myers fails to carry its burden to demonstrate that summary judgment should be granted on its breach of contract claim.

## B. Myers' Wrongful Termination Claim

Myers next argues that the undisputed facts demonstrate that OCS wrongfully terminated the Subcontract for default. To justify a termination by default, the party issuing the termination (here, OCS) has the burden to establish that the opposing party (Myers) was in default for failing to provide the goods or services promised under the subcontract. Libertatia Assocs., Inc. v. United States, 46 Fed. Cl. 702, 705 (2000). After the default is established, the defaulting party is "bound by the termination for default unless it can show that the default was excusable, or that

---

[3] Alternatively, one could reasonably find that Myers could not feasibly cure any of the outstanding issues if the cure period that OCS allotted was disingenuous, or if the restrictions that USACE and OCS had imposed did not allow Myers to perform the work required to cure. However, what is certain is that at the summary judgment stage, it is not the Court's role to determine which of these competing positions is more compelling.

the termination was otherwise defective." Bell BCI Co. v. HRGM Corp., No. Civ. JFM-03-1357, 2004 WL 3222885, at *3 (D. Md. Aug 6, 2004).

Here, Myers does not argue that its default is excusable, but instead that the termination process was defective and that the improper default termination should be converted into a "termination for convenience," as required under Article 10.2 of the Subcontract.[4] Consistent with the position Myers takes on its breach of contract claim, Myers alleges that the termination was defective because OCS issued the cure notice in bad faith, and alternatively, that the safety stand down order prevented Myers from curing. However, for the reasons previously discussed, there are sufficient factual conflicts surrounding OCS's actions on August 9 and during the cure period to preclude summary judgment on Myers' wrongful termination claim. Put another way, Myers has not met its burden to show that the Subcontract should be converted from a default termination into one for convenience.

---

[4] Article 10.2 of the Subcontract states that "the Contractor shall have the right to terminate this subcontract for its own convenience for any reason, by giving written notice of termination to subcontractor, effective upon receipt thereof by subcontractor." ECF No. 40-2, at 9. Though a notice period is not required for a termination for convenience, such termination under Article 10.2 requires that the subcontractor be paid its actual cost for labor and materials, reasonable windup costs, plus fifteen percent (15%) for overhead and profit.

14

### C. OCS's Breach of Contract Counterclaim

Lastly, Myers seeks summary judgment on OCS's counterclaim on grounds that OCS failed to comply with the cure provision of the Subcontract and therefore wrongfully terminated and materially breached the Subcontract. That is, Myers argues that OCS is legally precluded from recovering on its affirmative breach of contract claim because of OCS's own breach. For the same reasons set forth above, Myers fails to establish as a matter of law that OCS wrongfully terminated or otherwise breached the Subcontract. Accordingly, Myers does not carry its burden to demonstrate that OCS's counterclaim for breach of contract should be decided at the summary judgment stage.

### IV. CONCLUSION

For the reasons stated herein, Myers' motion for partial summary judgment is **DENIED**. The clerk is **DIRECTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ _____
Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May 18, 2022

15